[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13883

_____

D.C. Docket No. 3:16-cv-00170-RV-HTC

PATRICIA LACOURSE,
Individually and as personal representative
of the Estate of Lt. Colonel Matthew LaCourse,

Plaintiff - Appellant,

versus

PAE WORLDWIDE INCORPORATED, et al.,

Defendants,

DEFENSE SUPPORT SERVICES LLC,
Witness 7,
Witness 8,
Witness 9,
JOHN DOES,
1 through 10 inclusive,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(November 17, 2020)

Before WILSON, NEWSOM, and ANDERSON, Circuit Judges.

NEWSOM, Circuit Judge:

This appeal requires us to decide whether and to what extent the Death on the High Seas Act, 46 U.S.C. §§ 30301–08, applies to Patricia LaCourse's wrongful-death action, in which she alleges that PAE Worldwide Incorporated failed to properly service and maintain the F-16 that her husband was flying when it crashed into the Gulf of Mexico. We must also determine whether PAE, which was operating under a services contract with the United States Air Force, is shielded from liability by the so-called "government contractor" defense.

For the reasons that follow, we hold that DOHSA governs LaCourse's action, that it provides LaCourse's exclusive remedy and preempts her other claims, and that PAE is entitled to the protection of the government-contractor defense.

**I**

**A**

The tragic story underlying this appeal began when an Air Force F-16 fighter jet departed Tyndall Air Force Base, east of Panama City, Florida, for a continuation-training sortie. The only person on board was the pilot, Matthew LaCourse, a retired Air Force Lieutenant Colonel employed as a civilian by the Department of Defense. The plan was for Lt. Col. LaCourse to take the jet out

2

over the Gulf of Mexico, perform a series of training maneuvers, and then return to Tyndall.  Unfortunately, he never came back.  During the flight—for reasons the parties dispute—the F-16 crashed into the Gulf more than twelve nautical miles offshore.  Sadly, Lt. Col. LaCourse was killed.

Five years prior to the accident, PAE's predecessor—Defense Support Services—had been awarded a contract with the Air Force to provide aircraft service and maintenance at Tyndall, including, as it turns out, on the F-16 that Lt. Col. LaCourse was flying when he crashed.  In performing under the contract, PAE was required to follow detailed guidelines and adhere to specific standards, including Air Force Instructions (AFIs), Technical Orders (TOs), and Job Guides (JGs), all of which were prepared by or on behalf of the Air Force.

F-16s are equipped with two hydraulic systems: A and B.  The systems operate independently of one another and are designed to allow the plane to continue to fly in the event that one of them fails.  Beginning two months before the crash, the jet at issue here experienced a succession of problems that implicated one or both of its hydraulic systems.  In particular, on separate occasions: (1) hydraulic fluid was discovered in the outboard flight-control accumulator gauge; (2) System B's hydraulically actuated landing gear twice failed to retract during flight; (3) a hydraulic system pressure-line clamp on System A broke; (4) System B's reservoir accumulator was found to be depleted; (5) a pre-flight control check

3

revealed a hydraulic leak; (6) System A's cockpit indicator showed no pressure and System B's flight-control accumulator pre-charge was low; and (7) both systems failed a "confidence run."[1]  The F-16 was serviced and parts were repaired or replaced as these problems were identified.

On the day of the crash, the F-16 experienced two issues shortly before takeoff.  First, the emergency-power unit took longer than expected to activate during the pre-flight check.  Second, and more importantly for our purposes, the jet initially failed the "pitch-override check"—in which the pilot applies full pressure to the stick and presses a switch to make the stabilizers at the tail move a few inches or degrees in a nose-down direction.  Despite these two "hiccups," as one witness called them, the jet ultimately passed all of its pre-flight checks, which indicated no problem with the hydraulic systems.  The PAE mechanics who conducted the pre-flight checks were satisfied that the plane was safe to operate, and they released it for flight.

During the sortie, the F-16 performed a number of aerial maneuvers leading up to a "pitch-back"—an over-the-shoulder tactical maneuver in which the pilot uses the pitch axis to rejoin another aircraft.  By all accounts, everything leading up to the pitch-back appeared normal—*i.e.*, no gauge, light, warning, or caution

---

[1] The district court assumed that each of these problems was related to the hydraulic systems for purposes of deciding LaCourse's claims on summary judgment but noted that this was "far from certain."

4

indicated any problem, and there were no reports of any vibrations, shakes, etc. The issue that led to the crash occurred at the end of the pitch-back maneuver—Lt. Col. LaCourse appeared to level off and there followed, as one witness described it, "a period of no data, no inputs, no control or . . . no maneuvers," at which point the jet entered a "pitch-down" from about 12,000 feet.  There is no evidence that Lt. Col. LaCourse made any effort to eject or radio for help during his final descent.[2]

## B

Lt. Col. LaCourse's widow and personal representative, Patricia LaCourse, filed this wrongful-death action and jury demand in Florida state court alleging state-law claims for negligence, breach of warranty, and breach of contract.  PAE removed the case to federal court based on federal-officer jurisdiction, diversity jurisdiction, and jurisdiction under DOHSA—which, in relevant part, confers admiralty jurisdiction "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas."  46 U.S.C. § 30302.  Resisting PAE's removal, LaCourse disputed that federal jurisdiction existed on any basis.

---

[2] Although it has no real bearing on the issues before us, it's worth noting—by way of background—that the parties vigorously dispute the crash's cause.  LaCourse and her experts blame the F-16's dual-hydraulic system, as well as PAE's failure to discover, diagnose, and address the problems.  PAE and its experts, by contrast, posit that Lt. Col. LaCourse suffered a G-induced loss of consciousness following the pitch-back.

Once in federal court, PAE moved for partial summary judgment, arguing that DOHSA governed LaCourse's suit and, accordingly, that any potential recovery should (per the statute) be limited to pecuniary damages. The district court granted PAE's motion and held that DOHSA applies and "provides the exclusive remedy for death on the high seas, preempts all other forms of wrongful death claims, and only permits recovery for pecuniary damages."

PAE then filed a motion to strike—or, in the alternative, for partial summary judgment—asking the district court to strike LaCourse's state-law breach-of-warranty and breach-of-contract claims, as well as her jury demand. The district court again granted PAE's motion, concluding that because DOHSA preempts all other wrongful-death causes of action, LaCourse's warranty and contract claims had to be stricken. The district court further held that because all that remained was the DOHSA claim, LaCourse was not entitled to a jury trial.

PAE subsequently moved for final summary judgment, contending that it was protected by the "government contractor" defense, which extends the United States' sovereign immunity to a federal-government contractor, thereby shielding it from civil liability, provided that, among other things, the contractor complies with reasonably precise government specifications. The district court once again agreed with PAE and granted it summary judgment on government-contractor grounds.

6

This is LaCourse's appeal.[3]

## II

Before us, LaCourse argues that the district court erred in several ways. First, she contends that the court wrongly held that DOHSA governs this case—both (1) because by its plain terms DOHSA applies only when a death is caused by "wrongful act, neglect, or default occurring on the high seas," whereas the alleged negligence here occurred on land, and (2) because, in any event, her husband's plane crash lacked a "maritime nexus." Second, LaCourse argues that the district court erred in striking her breach-of-warranty and breach-of-contract claims because they don't seek a remedy broader than DOHSA and therefore aren't preempted. Finally, she asserts that the district court improperly applied the

---

[3] As PAE points out, LaCourse's notice of appeal identified only two of the district court's three orders—the order striking her non-DOHSA claims and her jury demand (Doc. 90) and the order granting PAE final summary judgment based on the government-contractor defense (Doc. 134). The notice did not specifically state that LaCourse was also appealing the district court's initial order concluding that DOHSA applied and supplied her exclusive remedy (Doc. 74). LaCourse acknowledges the oversight in her reply brief, but as she explains, it is "well settled that an appeal is not lost if a mistake is made in designating the judgment appealed from where it is clear that the overriding intent was effectively to appeal." *KH Outdoor, LLC v. City of Trussville*, 465 F.3d 1256, 1260 (11th Cir. 2006) (citation omitted). LaCourse's intent to appeal all three orders is apparent from the briefing, and PAE addressed all three orders (and constituent issues) in its response. Moreover, and in any event, our review of the latter two orders necessarily requires us to review the district court's determination of DOHSA's applicability. So in short, LaCourse's oversight hasn't prejudiced either party and, based on our case law, it's appropriate to let it slide under the circumstances.

government-contractor defense because PAE failed to show that it complied with the Air Force's reasonably precise specifications for maintaining the F-16.[4]

We will examine each contention in turn.[5]

## A

The first question we must address is whether DOHSA applies to LaCourse's suit. The district court held that it does; LaCourse insists that it doesn't.

In relevant part, DOHSA's operative provision states that

> [w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas . . . the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible.

46 U.S.C. § 30302. DOHSA's applicability matters, among other reasons, because it limits a plaintiff's recovery to "compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought" and thereby forecloses recovery for emotional injury and punitive damages. *Id*. § 30303.

---

[4] LaCourse also contends that the district court erred in striking her jury demand. But because—for reasons we'll explain—we hold that the district court's grant of summary judgment in PAE's favor is due to be affirmed, we needn't reach the jury-demand issue.

[5] "We review the district court's grants of partial summary judgment and summary judgment *de novo,* reviewing all facts and reasonable inferences in the light most favorable to the nonmoving party, and applying the same standard as the district court." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

**1**

LaCourse first argues that the district court erred in holding that DOHSA applies because the "wrongful act, neglect, or default" asserted here—PAE's negligent maintenance of the F-16—did not "occur[] on the high seas," as the Act's plain language requires. Rather, she says, the alleged negligence occurred on land—when the jet was improperly serviced at Tyndall Air Force Base. Accordingly, LaCourse contends, DOHSA doesn't apply to her suit.

If we were writing on a clean slate, we would almost certainly agree. LaCourse is exactly right that, according to its language, DOHSA applies only when the "death of an individual is caused by wrongful act, neglect, or default occurring on the high seas." And she is also right that the alleged "wrongful act, neglect, or default" here occurred not "on the high seas," but on terra firma. Unfortunately for LaCourse, though, we are bound by controlling precedent to reject her plain-text argument. In *Offshore Logistics, Inc. v. Tallentire*, for instance, the Supreme Court observed that "admiralty jurisdiction is expressly provided under DOHSA *[where] the accidental deaths occurred beyond a marine league from shore.*" 477 U.S. 207, 218 (1986) (emphasis added). So too, in *In re Dearborn Marine Service, Inc.*, our predecessor court, whose decisions bind us,[6] recognized that "DOHSA has been construed to confer admiralty jurisdiction over

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

claims *arising out of airplane crashes on the high seas though the negligence alleged to have caused the crash occurred on land*." 499 F.2d 263, 272 n. 17 (5th Cir. 1974) (emphasis added); *accord, e.g.*, *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1111 (5th Cir. 1982) ("[T]he simple fact that [plaintiff's] death occurred as a result of an aircraft crash into the high seas is alone enough to confer jurisdiction under the DOHSA. . . . [A]dmiralty jurisdiction has repeatedly been extended to cases in which death or injury occurred on navigable waters even though the wrongful act occurred on land. The place where the negligence or wrongful act occurs is not decisive.") (footnote omitted). It's not for the three of us to second-guess the correctness of *Offshore Logistics* or *Dearborn Marine*. Because we are bound by those decisions, we are constrained to agree with the district court that DOHSA applies despite the fact that PAE's alleged negligence occurred on land at Tyndall Air Force Base.

**2**

LaCourse separately argues that DOHSA doesn't govern here because the plane crash that killed her husband lacked a "maritime nexus," which she insists is required by the Supreme Court's landmark admiralty decision in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972).

In that case, a plane flying from Ohio to Maine crashed into Lake Erie after striking a flock of seagulls shortly after takeoff. *Id.* at 250. Although the crew

10

wasn't injured, the plane was a total loss, so its owners brought an action in admiralty, alleging negligence by several airport employees. *Id.* at 250–51. The Supreme Court held that maritime locality alone—there, Lake Erie's navigable waters—is not a sufficient predicate for admiralty jurisdiction in aviation-tort cases, and that "in the absence of legislation to the contrary," claims arising from airplane crashes are not cognizable in admiralty unless the alleged wrong bears "a significant relationship to traditional maritime activity"—*i.e.*, has a maritime nexus. *Id.* at 268. Because the flight in *Executive Jet* "would have been almost entirely over land . . . within the continental United States" and was "only fortuitously and incidentally connected to navigable waters," the Court determined that it bore "no relationship to traditional maritime activity"—and, accordingly, that admiralty jurisdiction was lacking. *Id.* at 272–73. LaCourse argues that, like the flight in *Executive Jet*, her husband's flight—which was intended to begin and end at Tyndall Air Force Base—was also only "fortuitously over water" and thus bore no significant relationship to "traditional maritime activity."

The problem with LaCourse's argument is that *Executive Jet* didn't involve DOHSA—there were no injuries, let alone any fatalities to support a wrongful-death claim. *Id.* at 250. And significantly, the Supreme Court was careful there to include a caveat when announcing its holding—namely, that a maritime nexus is required only "in the absence of legislation to the contrary." *Id.* at 268. And

11

indeed, the Court in a footnote specifically identified DOHSA as an example of a statute that would constitute "legislation to the contrary." *Id.* at 274 n. 26.

If *Executive Jet* stood alone, LaCourse's maritime-nexus argument might still have a chance. In flagging DOHSA as an example of "legislation to the contrary," the Court suggested that the Act might apply only to flights that *require* traversing the high seas: "Some such flights, e.g., New York City to Miami, Florida, *no doubt* involve passage over 'the high seas beyond a marine league from the shore of any State.' To the extent that the terms of the Death on the High Seas Act become applicable to *such flights*, that Act, of course, is 'legislation to the contrary.'" *Id.* (emphasis added). Because Lt. Col. LaCourse's sortie didn't *require* him to fly over the ocean, the argument would go, it wasn't one of the "such flights" that the *Executive Jet* Court thought DOHSA would cover.

But *Executive Jet* wasn't the Supreme Court's last word on DOHSA's application to aviation-based torts. Rather, as already explained, the Court held in *Offshore Logistics* that DOHSA applies to *all* cases—including aviation-related cases—in which a death occurs on the high-seas. *See* 477 U.S. at 218. In the course of so holding, the Court explained the applicability (or non-applicability, as the case may be) of the maritime-nexus requirement in these terms: "[A]dmiralty jurisdiction is expressly provided under DOHSA [where] the accidental deaths occurred beyond a marine league from shore. *Even without this statutory*

12

*provision*, admiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity." *Id.* at 218–19 (emphasis added). Translation: Where a death occurs on the high seas, DOHSA applies, full stop; separately, in a non-DOHSA case, maritime jurisdiction might still exist, provided that there is a maritime nexus. To the extent that *Executive Jet*'s New-York-to-Miami footnote left any doubt, *Offshore Logistics* clarified that the occurrence of a death on the high seas is a sufficient condition to DOHSA's application—without any further maritime-nexus gloss.[7]

In sum, then, we agree with the district court that DOHSA doesn't require a maritime nexus—and therefore, that because (on the Supreme Court's

---

[7] In support of her maritime-nexus argument, LaCourse points to *Miller v. United States*, 725 F.2d 1311 (11th Cir. 1984), in which we assumed (without actually considering or specifically deciding) that a maritime nexus may be required under DOHSA. *See id.* at 1315 (concluding that DOHSA provided jurisdiction over an aviation crash after determining that there *was* a maritime nexus on the facts of that case). We think it a full answer to *Miller* to recognize that it was decided before the Supreme Court clarified in *Offshore Logistics* that DOHSA imposes only a locality requirement, and not a separate maritime-nexus requirement. Other courts have distinguished *Miller* on precisely this basis, and we agree with their assessment. *See, e.g.*, *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 918 (9th Cir. 2002) (listing *Miller* as an example of how "several courts initially presumed" that DOHSA required a maritime nexus, but noting that those cases came before *Offshore Logistics* and that now, "the prevailing view holds that DOHSA established independent requirements for the exercise of admiralty jurisdiction"); *see also Palischak v. Allied Signal Aerospace Co.*, 893 F. Supp. 341, 345 & n.5 (D.N.J. 1995) (holding that "the requirement of a traditional maritime nexus is not a prerequisite to the exercise of admiralty jurisdiction pursuant to DOHSA," and (citing *Miller*) noting that "[w]e are unable to locate a single decision after [*Offshore Logistics*] in which a lower court required a maritime nexus before applying DOHSA"); *Bernard v. World Learning Inc.*, 2010 WL 11505188, at *8 n.14 (S.D. Fla. June 4, 2010) (acknowledging the circuit precedent in *Miller* but explaining that it was decided prior to *Offshore Logistics* and holding that a maritime nexus is no longer required in DOHSA cases).

13

interpretation) the Act applies whenever a death occurs on the high seas, it governs LaCourse's wrongful-death suit.

**B**

Having concluded that DOHSA applies to LaCourse's action, we must now determine whether it provides her exclusive remedy, such that it preempts all other claims arising out of her husband's crash.

The district court concluded that LaCourse's breach-of-warranty and breach-of-contract claims—both of which she initially brought under Florida's Wrongful Death Act, Fla. Stat. § 768.16—had to be stricken on the ground that where DOHSA applies it "preempts all other forms of wrongful death claims." LaCourse contends that the district court erred because, she says, her state-law claims don't seek a remedy broader than DOHSA and therefore aren't preempted.

Again, while it seems to us that LaCourse might have the plain language on her side—in a section titled "Nonapplication," DOHSA expressly states that it "does not affect the law of a State regulating the right to recover for death," 46 U.S.C. § 30308—the controlling precedent is squarely against her. In particular, the Supreme Court held in *Offshore Logistics* that "in light of the language of the Act as a whole, the legislative history of [§ 30308's predecessor], the congressional purposes underlying the Act, and the importance of uniformity of admiralty law," the provision that is now codified at § 30308 "was intended only to

14

serve as a jurisdictional saving clause, ensuring that state courts enjoyed the right to entertain causes of action and provide wrongful death remedies both for accidents arising on territorial waters and, under DOHSA, for accidents occurring more than one marine league from shore." 477 U.S. at 221. And, the Court continued, once it is determined that § 30308 (or there, its predecessor) "acts as a jurisdictional saving clause, and not as a guarantee of the applicability of state substantive law to wrongful deaths on the high seas, the conclusion that the state statutes are pre-empted by DOHSA where it applies is inevitable." *Id.* at 232.

Put simply, under *Offshore Logistics*, § 30308 preserves only state-court jurisdiction—*not* state substantive wrongful-death law—and where DOHSA applies, it preempts all other wrongful-death claims under state or general maritime law. Accordingly, we hold that the district court was correct to conclude that DOHSA forecloses LaCourse's breach-of-warranty and breach-of-contract claims.

## C

Having concluded that DOHSA governs LaCourse's suit and supplies her exclusive remedy, we must now determine whether LaCourse's claim is barred by the so-called "government contractor" defense. Provided that certain conditions are met, that defense—a creation of federal common law—extends the United States' sovereign immunity to a government contractor, thereby protecting it against civil liability. In essence, it allows the contractor to escape liability on the

15

ground that it was "just following orders."  LaCourse asserts that the district court

erred in applying the government-contractor defense because PAE failed to

establish that it conformed to the government's reasonably specific maintenance

procedures.[8]

The Supreme Court fashioned the government-contractor defense in *Boyle v.*

*United Technologies Corporation*, 487 U.S. 500 (1988).  There, the Court held, in

a suit alleging design defects in military equipment, that a private contractor could

partake of the United States' sovereign immunity so long as the following three

conditions were satisfied: "(1) the United States approved reasonably precise

specifications; (2) the equipment conformed to those specifications; and (3) the

supplier warned the United States about the dangers in the use of the equipment

that were known to the supplier but not to the United States."  *Id.* at 512.

Although *Boyle* dealt specifically with government procurement contracts,

we extended its analysis to cover government *service* contracts in *Hudgens v. Bell*

*Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003).  To account for the

---

[8] LaCourse also argues that PAE shouldn't be entitled to immunity in this case because its maintenance contract with the Air Force specifically stated that PAE "shall be . . . responsible for all injuries to persons or damage to property that occurs as a result of its fault or negligence." But the allocation of liability between PAE and the government has nothing to do with PAE's immunity from liability to a third party.  Given the point of the government-contractor defense— to allow the government to hire contractors to perform uniquely governmental duties without subjecting them to the risk of liability to third parties—it would make little sense to interpret the contract language as LaCourse suggests.  The far better—and we think obvious—reading is that the quoted text merely allocates liability between PAE and the Air Force, not liability between PAE and a third party.

contextual switch from a design-defect case to a negligent-maintenance case, we rejiggered the defense's three elements as follows: "(1) the United States approved reasonably precise maintenance procedures; (2) [the contractor's] performance of maintenance conformed to those procedures; and (3) [the contractor] warned the United States about the dangers in reliance on the procedures that were known to [the contractor] but not to the United States." *Id.* at 1335.

Helpfully, the parties have narrowed the focus here. LaCourse concedes that the Air Force provided reasonably precise maintenance procedures, so there's no question that the first *Boyle/Hudgens* element is satisfied. And the district court held that the third element "does not apply because (as PAE has argued, and as the plaintiff has not disputed) there is no contention that PAE had knowledge that it withheld from the government," and neither party appears to take issue with that conclusion. So all seem to agree that the application of the government-contractor defense here turns on the second *Boyle/Hudgens* element—whether, in servicing the F-16, PAE conformed to the Air Force's reasonably precise maintenance procedures.

In its summary-judgment motion, PAE argued that its maintenance conformed to the government's reasonably precise procedures, and it cited an abundance of supporting evidence, including deposition testimony from multiple employees, an Accident Investigation Board maintenance member, and the Safety

17

Investigation Board investigator.  *See* Deposition of Timothy Davis at 7:20–8:11, 117:17–118:18 (testifying that all maintenance performed under the contract, including the service of Lt. Col. LaCourse's F-16, conformed to the Air Force's rules, regulations, and technical orders); *see also* Deposition of Michael Reeves at 106:4–106:18 (similar); Deposition of Michael Bogaert at 7:8–9:20 (similar); Deposition of AIB Investigator, Captain Michelle Chiaravelle at 26:10–26:17 (similar); Deposition of SIB Investigator, Senior Master Sergeant Marquell Fallin at 13:10–13:22, 19:8–19:23 (similar).  In light of PAE's extensive evidence of compliance, the district court held that LaCourse failed to present evidence that PAE *violated* government procedures sufficient to create a genuine dispute of material fact.

In the "Statement of Facts" section of her opening brief on appeal, LaCourse identified three Air Force maintenance procedures under the subheading "The Defendant's Lack of Compliance with the Air Force's Specifications and Instructions."  First, she stated that under AFI 21-101 ¶ 7.1, when there are system malfunctions of a "chronic nature" the aircraft "should" (her word) be impounded and prevented from flying until there are "'investigative efforts' to uncover the root cause."  Second, LaCourse said that under AFI 21-101 ¶ 7.5.4 an airplane "must" be impounded "following an uncommanded flight control movement," which she claims occurred when the stabilizers didn't move as directed during the

final pre-flight check.  Finally, she cited TO 1-1-300, which states that a procedure called a "functional flight check" is "normally" conducted following maintenance work and before an airplane is released to fly.

LaCourse's contention that PAE violated reasonably precise maintenance procedures—so as to foreclose its reliance on the government-contractor defense—fails on numerous grounds.  As an initial matter, she has almost certainly abandoned her arguments based on the procedures she cites.  We have repeatedly held that an appellant abandons an argument on appeal when she fails to "specifically and clearly identif[y]" it or "plainly and prominently" raise it in her opening brief.  *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004); *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 530 (11th Cir. 2013).  In particular, we will deem an appellant to have abandoned an argument where she makes only "passing references" to it in the background sections of her brief—or, for that matter, even the brief's argument section.  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014).  Under our consistent precedent, LaCourse's scattered references to Air Force procedures in the "Statement of the Facts" section of her opening appellate brief—followed by a single (and vague) invocation of "AFI 21-101" on a single page in the "Argument" section—were insufficient to present a legal argument based on PAE's alleged noncompliance with them.

19

Moreover, and in any event, LaCourse's arguments fail on the merits. With respect to AFI 21-101 ¶ 7.1 and TO 1-1-300, it is enough to note that they merely permit, rather than require, impoundment and functional check flights, respectively, under specified circumstances. A government contractor doesn't violate reasonably precise maintenance procedures by taking a course of action—repair, replacement, retesting—that those procedures at least implicitly allow.[9]

Had LaCourse properly presented it, an argument based on AFI 21-101 ¶ 7.5.4—which, unlike the other two procedures on which she relies, *requires* impoundment following an "uncommanded flight control movement"—might have been somewhat stronger, but for reasons we will explain, even it would fail.

In resisting the application of the government-contractor defense, LaCourse cited testimony from Timothy Davis and Michael Bogaert—PAE employees tasked with the preflight checks on the day of the crash—both of whom testified that Bogaert (1) didn't see the stabilizers move as far as they should have during the initial pitch-override check and (2) instructed Lt. Col. LaCourse to repeat the

---

[9] LaCourse also asserted—albeit again only in the "Statement of Facts" section of her opening brief—that Lt. Col. LaCourse's F-16 "should" have been impounded for a "root cause" investigation. When pressed at oral argument about what procedure required such an investigation, LaCourse's counsel pointed to the following language in AFI 21-101 ¶ 7.1: "Impounding aircraft and equipment enables investigative efforts to systematically proceed with minimal risk relative to intentional/unintentional actions and subsequent loss of evidence." Oral Argument at 32:10. But even if LaCourse had developed this assertion into a legal argument outside of the background section of her brief, the cited language says nothing about a root-cause investigation, let alone a mandatory one.

sequence until the stabilizers performed properly. LaCourse contends that the jet should have been grounded after the first sequence. PAE counters that Bogaert's description of the check indicates that Lt. Col. LaCourse simply wasn't performing the sequence properly, not that there was any sort of issue with the control.

By way of background, here is the relevant portion of Bogaert's testimony:

Q: During the pitch override check, did you see the horizontal stabs move at all?

A: After I got on the headset, after when [Mr. Davis] had finished checking brakes, I got on a headset with [Lt. Col. LaCourse] and asked him if he had done it. He said yes. I told him I didn't see it. He said do you want me to do it again. I said yes, if you don't mind. At which point he tried to do it again, and they didn't move. And I asked him, are you holding the stick full forward, and he wasn't. He was just pushing, and they're reaching over and he's releasing his pressure on the stick, is my best guess. But I told him, no, [Lt. Col. LaCourse], that's not it, and asked him, are you holding the stick full forward as you hit that switch. And he did that, and it worked perfect. He released. I said that's what I was looking for, technique.

Even aside from abandonment, there are several problems with LaCourse's AFI 21-101 ¶ 7.5.4 argument. First, whereas that procedure triggers mandatory impoundment only upon the occurrence of an "uncommanded . . . movement," Bogaert's testimony describes (at most) the exact converse—a *commanded non-movement*. In particular, Bogaert recounted that he saw Lt. Col. LaCourse attempt to move the stabilizers by pushing the stick (the command) but explained that they initially "didn't move" (the non-movement). Accordingly, it's not at all clear to us that, by its plain terms, AFI 21-101 ¶ 7.5.4 even applies.

21

Second, LaCourse has pointed to no expert testimony or other evidence connecting attorney argument (or, more precisely, attorney factual recitation) to an actual AFI 21-101 ¶ 7.5.4 violation. Rather, she offers only lay testimony describing what happened during the test. She presents no expert (or even lay) testimony explaining *why* what happened constituted an "uncommanded flight control movement" triggering a mandatory impoundment. LaCourse's evidence, we think, is insufficient to permit a reasonable jury to find that PAE violated AFI 21-101 ¶ 7.5.4.

Finally, even under the most charitable reading, Bogaert's testimony describes not a breach of procedure, but a likely pilot error—Lt. Col. LaCourse, Bogaert said, simply wasn't performing the check properly. Bogaert explained that Lt. Col. LaCourse wasn't "holding the stick full forward" and that once he performed the check using the proper technique, it "worked perfect[ly]."

For all these reasons, even if LaCourse had properly presented an argument that PAE violated AFI 21-101 ¶ 7.5.4, we would reject it.

*   *   *

In sum, LaCourse failed to produce evidence sufficient to create a genuine issue of material fact that PAE violated government procedures. LaCourse's real argument seems to be that PAE's mechanics should have dug deeper into the F-16's hydraulic-related problems, because, had they done so, they would have

22

discovered that the hydraulic systems were compromised.  But while what LaCourse and her experts believe PAE should have done differently surely has some bearing on the merits of her DOHSA-based negligence claim, it is irrelevant to the question whether PAE is protected by the government-contractor defense. All that matters on that score is whether PAE violated reasonably precise government procedures, and based on the evidence presented from both parties we conclude that it did not.  Accordingly, we affirm the district court's decision that PAE is entitled to summary judgment on government-contractor grounds.

## III

For the foregoing reasons, we hold that DOHSA applies to and governs LaCourse's case, that the Act provides her exclusive remedy, and that PAE is shielded from liability by the government-contractor defense.  Accordingly, we affirm the district court's grant of summary judgment in favor of PAE.

**AFFIRMED**.

NEWSOM, Circuit Judge, with whom WILSON, Circuit Judge, joins, concurring:

I write separately to explain that, while I agree that we must follow existing precedent to hold that DOHSA applies to (and thereby supplies the exclusive wrongful-death remedy for) any claim arising out of a death occurring on the high seas—even where, as here, the negligence alleged to have caused the death occurred on land—I do so holding my nose, as DOHSA's plain language is squarely to the contrary.

As a refresher, DOHSA's operative provision states in relevant part that "[w]hen the death of an individual is caused by a wrongful act, neglect, or default occurring on the high seas . . . the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302. LaCourse contends (1) that DOHSA applies only when the *negligence* occurred on the high seas, without respect to where the *death* occurred, and (2) that all here agree that the alleged negligence occurred on land, when the jet was improperly serviced at Tyndall Air Force Base. Accordingly, she insists, DOHSA doesn't govern her case.

LaCourse's logic, it seems to me, is unassailable. By its plain terms, DOHSA limits its application to instances in which the "wrongful act, neglect, or default occur[ed] on the high seas," regardless of where the resulting death occurred. Indeed, there is no reasonable reading of the Act by which the phrase

24

"occurring on the high seas" modifies the word "death" rather than the phrase "wrongful act, neglect, or default."  One needn't even resort to the canons to come to that conclusion—the plain, ordinary, and obvious meaning of the words is sufficient.  (Having said that, the canons would lead to precisely the same determination.  *See Nearest-Reasonable-Referent Canon*, Black's Law Dictionary (11th ed. 2019); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012).)

Somehow, though, precedent—mounds of it, some of it binding on us—has whistled past the text's unmistakable focus of the location of the alleged negligence as the decisive factor for determining DOHSA's applicability.  For instance—

- *Miles v. Apex Marine Corp.*, 498 U.S. 19, 25 (1990) ("DOHSA . . . create[ed] a wrongful death action for *all persons killed on the high seas*.")

- *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1986) ("Here, admiralty jurisdiction is expressly provided under DOHSA because the accidental deaths occurred beyond a marine league from shore.")

- *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 620 (1978) (noting that DOHSA creates "a remedy in admiralty for wrongful deaths more than three miles from shore")

- *In re Dearborn Marine Serv., Inc.*, 499 F.2d 263, 272 n. 17 (5th Cir. 1974) ("DOHSA has been construed to confer admiralty jurisdiction over claims arising out of airplane crashes on the high seas though the negligence alleged to have caused the crash occurred on land.")

25

- *Bergen v. F/V ST. PATRICK*, 816 F.2d 1345, 1348 (9th Cir. 1987) ("[DOHSA] has been held to refer to the site of an accident on the high seas, not to where . . . the wrongful act causing the accident may have originated.")

- *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1111 (5th Cir. 1982) ("[T]he simple fact that [plaintiff's] death occurred as a result of an aircraft crash into the high seas is alone enough to confer jurisdiction under the DOHSA. … [A]dmiralty jurisdiction has repeatedly been extended to cases in which death or injury occurred on navigable waters even though the wrongful act occurred on land.  The place where the negligence or wrongful act occurs is not decisive.") (footnote omitted)

I could go on and on and on—this is but a small sampling of cases holding that DOHSA applies to any claim arising out of a death occurring on the high seas, wholly without regard to where the underlying negligence occurred.  But again, that seems obviously wrong to me.

I'm not the first to recognize the textual disconnect.  The Fifth Circuit, for instance, once remarked that "[a]t first glance, the plain text of this statutory provision seems to indicate that DOHSA is implicated only when the wrongful act precipitating death occurs on the high seas."  *Motts v. M/V Green Wave*, 210 F.3d 565, 569 (5th Cir. 2000).  But the court went on:  "As subsequent courts have interpreted DOHSA, however, the statute's application is not limited to negligent acts that actually occur on the high seas.  The Supreme Court has repeatedly noted that when the death itself occurs on the high seas, DOHSA applies."  *Id*.  My only disagreement with the Fifth Circuit's assessment is the "[a]t first glance" part.  I've

26

read § 30302 over and over—glanced, peered, gawked, and glared—and I can't

make it say anything other than that DOHSA applies when the alleged act of

*negligence*—rather than the resulting *death*—occurs on the high seas.

So how did we get ourselves into this predicament—reading DOHSA to

mean something that it obviously doesn't say?  The answer, apparently, traces back

to century-old admiralty law premised on a "consummation of the injury" theory.

*See e.g.*, *In re Dearborn Marine*, 499 F.2d at 274 ("Historically maritime

jurisdiction has been measured by the locality of the wrong with locality defined as

where the 'substance and consummation of the injury' took place.") (citing *The

Plymouth*, 70 U.S. (3 Wall.) 20, 33 (1886)) (footnote omitted).  Put simply, if a

claim is premised on a negligence theory, the underlying negligence isn't complete

until it is "consummated in an actual injury."  *Lasky v. Royal Caribbean Cruises,

Ltd.*, 850 F. Supp. 2d 1309, 1312 (S.D. Fla. 2012).  So, the argument goes, a

DOHSA claim for wrongful death based on negligent service—as we have here—

accrues at the time and place where the allegedly wrongful act culminates in an

actual injury (the high seas), not when and where the negligence itself allegedly

occurred (at Tyndall Air Force Base).

That's fine.  It's just not what the statute says.  DOHSA doesn't say that the

decedent's personal representative may bring an action "when the death of an

individual *occurring on the high seas* is caused by wrongful act, neglect, or

27

default"; rather, it says that the personal representative can sue "[w]hen the death of an individual is caused by wrongful act, neglect, or default *occurring on the high seas*." 46 U.S.C. § 30302. End of story.

Bottom line: As in all cases, we should give effect to DOHSA's unambiguous language. *See, e.g.*, *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992) ("The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written."). If it were up to me, I would hold that DOHSA doesn't apply here because the alleged negligence—the failure to properly maintain the F-16 that Lt. Col. LaCourse was piloting when he crashed—occurred on land, not on the high seas.